| 3 | 520 |
| 55 | 112 |

---

Dr. JAMES VANMETER v. THOMAS JONES, Executor of THO-MAS JONES, deceased.

There can be no doubt of the power of the court of chancery to look into the judgments of other courts, and to set them aside on the ground of fraud.

The decrees of ecclesiastical courts, and of this court, will be relieved against or avoided on the same ground.

The power and jurisdiction of this court over decrees in chancery, is not taken away or abridged by that clause of the statute of New-Jersey which enacts, that the sentence or decree of the orphans' court shall be conclu-sive upon all parties, except in certain specified cases, where the account may be opened by the court itself.[*]

An executor, who was also an agent or trustee of the testator in his life time, after the final settlement of his accounts as executor in the orphans' court, cannot be called on to account in equity as such trustee. There can be no separate accounting in the two different capacities.

A court of equity exercises the power of setting aside decrees of the orphans' court for fraud, not on the ground of concurrent jurisdiction, but by reason of an inherent authority, growing out of the principles and constitution of the court, and extending itself over judgments of courts of every descrip-tion.

[*] See act of 13th June, 1820, sec. 32, Rev. Laws, 776.

[Vanmeter v. Ex'r of Jones.]

When and under what circumstances may fraud operate to impeach a decree? Will fraud in the incipient stage of a transaction be sufficient to overturn a decree subsequently obtained, when the party complaining of it was apprised of the facts on the trial, and had within his power the means of investigation; or is it to be confined to fraud in procuring the decree?— *Quære.*

In cases of family agreements and compromises, there must always be a mutual trust and confidence between the parties; and if there is any concealment of material facts, the compromise will be held invalid.

The inventory presented to the surrogate by an executor, should contain a specific enumeration of the goods, chattels and credits of the testator; a paper containing items, thus—" cash, bonds and notes,"—" household goods and kitchen furniture," is not, strictly speaking, an inventory, and may properly be rejected as such by the surrogate.

*Jeffers* and *Southard,* for complainant.

*Field* and *Wall,* for defendant.

THE CHANCELLOR. Thomas Jones, late of the county of Salem, died on the second of September, eighteen hundred and twenty-nine, at the age of seventy-nine years. In his will, which bears date on the fifth of July, eighteen hundred and twenty-three, he appointed his son, Thomas Jones, and his sons-in-law, Doct. James Vanmeter and David B. Smith, his executors; and after making sundry dispositions of real and personal estate, he bequeathed all the residue of his estate to his four children, viz.: Mary Yorke, Ruth Vanmeter the wife of the complainant, Thomas Jones, and Martha I. Smith the wife of David B. Smith, in equal shares. On the seventeenth of September, eighteen hundred and twenty-nine, the will was proved before the surrogate of Salem by Thomas Jones, one of the executors, the other two having previously renounced. On the twenty-first of the same month of September, James Vanmeter gave to the executor an instrument under his hand, in which he acknowledged to have received of the said executor three thousand dollars, and all the crop of wheat, rye and oats already raised by Andrew Remster for Thomas Jones, deceased, and all the crop

66

of corn on the Remster place, in full for the share of the personal estate bequeathed to his wife, Ruth Vanmeter, by the said last will of her father; and thereby exonerated him, the said executor, from the payment of any further sum, let the net balance be what it might; with a condition, that if on the settlement of the estate it should not yield a dividend equal to that amount, he the said Vanmeter should not be liable to refund.

In February, eighteen hundred and thirty, the executor exhibited his final account in the surrogate's office for allowance; by which it appeared that the net balance in his hands, to be divided as a residuum, according to the will, was thirteen thousand three hundred and forty-three dollars and thirty-nine cents.

In eighteen hundred and thirty-three, the complainant commenced a suit in the supreme court against the executor, in which he sought, as appears by the record, to recover for services rendered to the testator as physician for a number of years; and also to recover his full proportion or fourth part of the residuum of the estate. This suit was afterwards tried before a jury, and a verdict was rendered for the defendant.

The complainant then filed his bill in this court against the executor, in which he seeks, on the ground of misrepresentation and concealment, and of various acts of fraud, to charge the defendant, as trustee and executor, with divers large sums of money, in which he is equitably indebted to the estate, and for which he ought as executor to have accounted. He insists that the receipt, and also the settlement and decree in the orphans' court, were obtained by fraud; and he asks "that a general account may be taken between the said Thomas Jones, as well as agent and trustee of the said testator as executor, and that he be decreed to pay to the complainant the one fourth part of what may be found due on taking the said account."

The complainant's charges of fraud and misconduct on the part of the defendant, may be embraced within the following heads :—

1. That with the view of getting all the estate in his own hands, and the better to conceal his own indebtedness and mis-

[Vanmeter v. Ex'r of Jones.]

application of his father's funds, the defendant fraudulently induced James Vanmeter and David B. Smith, who were named with him as executors in the will, to renounce the office.

2. That he then, by concealment and misrepresentation, obtained from the complainant a receipt and discharge for all that part of the personal estate which was given to his wife in the will.

3. That the appraisement was illegally and fraudulently made.

4. That the note mentioned in the will, the principal of which was to be accounted for by the executor, was not included in the appraisement.

5. That the executor has not accounted for the moneys received by him as agent for his father, while he transacted his business for three years before his death.

6. That the decree of the orphans' court, as containing and declaring the balance in the hands of the executor, was procured by fraud, and should be set aside.

There can be no doubt of the power of this court to look into the judgments of other courts, and to set them aside on the ground of fraud. The decrees of ecclesiastical courts have often been relieved against on this ground: *Vanbrough* v. *Cock and al.,* 1 *Ch. Ca.* 201 ; *Bissell and al.* v. *Axtell and al.,* 2 *Vern.* 47. And so, in like manner, have awards: *Ld. Lonsdale* v. *Littledale,* 2 *Vesey,* 451 ; and verdicts: *Williams* v. *Lee,* 3 *Atk.* 223 ; *Bateman* v. *Willoe,* 1 *Scho. and Lef.* 201 ; and judgments at law : *Barnesley* v. *Powell,* 1 *Ves. sen.* 119 ; *Gainesborough* v. *Gifford,* 2 *P. Wms.* 424 ; *Humphreys* v. *Humphreys,* 3 *P. Wms.* 394. And even decrees of this court may be avoided for the same cause: *Loyd* v. *Mansell,* 2 *P. Wms.* 73 ; *Galley* v. *Baker, Ca. Temp. Talb.* 201; *Bradish* v. *Gee, Amb.* 229.

And with regard to decrees of the orphans' court, on the final settlement of accounts, although the legislature has declared that the sentences or decrees of those courts shall be conclusive upon all parties, and exonerate and discharge them from the claims of

creditors, except in certain specified cases, when the accounts may be opened by the courts themselves; yet it has been decided here, on demurrer, that the power and jurisdiction of this court is not taken away or abridged by that enactment; and that the decrees of the orphans' courts may be looked into and relieved against on the ground of fraud: *Burtis and al.* v. *Adm'rs of Barzillai Hopkins,* January term, 1823. This is no longer an open question.

The complainant in this case is concluded by the decree, unless it can be avoided on the ground of fraud. An attempt has been made to charge him in the separate capacity of agent or trustee—upon the principle that during the latter years of the testator's life, when he was infirm, and, as is alleged, incapable of transacting business, the defendant had the management of his pecuniary affairs; and that as he was not then executor, he may be called to account as trustee. I apprehend there is no foundation for this distinction. If there was any indebtedness or liability to the estate on the part of the defendant, it was his duty to account for it as executor. If he had any funds in his hands, they constituted so much of the assets of the estate, and were to be brought in to be disposed of in a due course of administration. They could be reached by creditors or legatees only through that medium. There can be no separate accounting in the two different capacities. And there is, therefore, nothing in the case to take it out of the general rule.

In looking at this matter of fraud, it may be useful to inquire when, and under what circumstances, fraud may operate so as to impeach a decree, or a judgment—for both stand upon the same foot. Will fraud or misrepresentation in the incipient stage of a transaction, be sufficient to overturn a verdict or judgment subsequently obtained, when the party complaining of it was apprised of the facts on the trial, and had within his power the means of investigation, and either omitted to make use of them or used them ineffectually? Or is it to be confined, in the language of some of the books, to fraud in procuring and obtaining the decree?

The present case will illustrate my meaning. The defendant is charged with procuring the renunciation of James Vanmeter and David B. Smith, who were named as co-executors, by fraudulent means and for fraudulent purposes. Admitting the fact to be so, and that the party might have avoided the act of renunciation, but did not, is it a ground for setting aside the final decree upon the accounts of the executor who thus procured the renunciations? Suppose the release or discharge to have been procured by misrepresentation or concealment, so as to render it invalid in equity, will that affect the decree? Will the fact that the note was not included in the appraisement be sufficient? The party, it will be seen, after the occurrence of all these circumstances, has permitted a final decree to be made by a proper tribunal, in which he had a full opportunity of being heard by witnesses, and of sifting the conscience of the executor by an open, personal examination, if he thought fit to do so.

In the case of *Burtis* v. *Hopkins*, already alluded to, it was charged by the creditors, that one of their number agreed to attend and file exceptions to the account of the administrators in behalf of all, and was appointed agent to do so; and that the administrators, being cognisant of the fact, paid him his claim, and gave him a premium not to appear. This was an instance of direct fraud in obtaining their settlement and decree, and was certainly within the power of the court. So in the present case, that part of the bill which charges the defendant with preventing a full investigation of the case in the orphans' court, by the compromise effected with David B. Smith, may be within the admitted power of the court. But as to some of the matters complained of, I have strong doubts of the propriety of any interference at this time by this court.

It is true the complainant here was not actually a party to the proceedings in the orphans' court; but why did he not come in and make himself a party? The proceedings were, in a certain sense, against him and all other parties interested. They were to be final. The account was before him. It was open to his investigation; and, upon ordinary principles, he should be con-

[Vanmeter v. Ex'r of Jones.]

cluded. He says, it is true, in general terms, that the investigation, so far as it proceeded, in the orphans' court, fully disclosed to him the fraud which had been practised on him in obtaining the receipt for the said legacy; but he does not disclose what were the facts and circumstances which then came to his knowledge, so as to enable the court to judge whether, with ordinary diligence, he might not have discovered them before, and whether he might not have had the full advantage of them all, if he had thought proper to file exceptions to the account.

And, then, with regard to the judgment of the supreme court; it is final between the parties, so far as the matters involved in this controversy were directly at issue. It is plain from the record, that the complainant sought to recover in that suit the amount of his distributive share, according to the account as settled in the orphans' court. It is distinctly declared for in two of the counts. This could be done only on the assumption that the release was void, and that he was not concluded by it. That issue was found with the defendant. It established the release. This suit in the supreme court was brought after the investigation in the orphans' court, at which time the complainant alleges he discovered the imposition that had been practised on him. With a full knowledge, then, of all the facts, he brought a suit, founded in part on the decree of the orphans' court. He sought to recover in the face of his receipt, and failed.

He comes now into this court to have that matter re-investigated. It is not shown that the subject was incapable of being discussed there, or that the court of law had not full jurisdiction. It is not alleged that the verdict was obtained by fraud, or that the defendant had any unconscientious advantage at law, which equity will either put out of the way, or restrain him from using. So far, then, as this part of the case is concerned, is it not a request for a new trial? And is this court at liberty to grant a new trial under such circumstances?

It does not alter the case, according to my view of it, that in matters of executors' accounts and settlements, this court has a concurrent jurisdiction with the orphans' court. It exercises the

power of setting aside decrees for fraud, not on the ground of concurrent jurisdiction, but by reason of an ancient, or rather an inherent authority growing out of the very principles and constitution of the court, and extending itself over the judgments of courts of every description.

From these premises, I am strongly inclined to think the complainant does not stand in a situation which entitles him to have all the matters of which he complains investigated anew, upon the allegation that there is fraud in them or in some of them, and thus avoid the judgment at law and also the solemn decree of the orphans' court. But as the defendant has not in his answer prayed any benefit from the judgment of the supreme court, or distinctly set it up as a bar to any part of the inquiry; and as there are more charges which, if substantiated, may be sufficient to impeach the decree of the orphans' court, and these are connected with others of a more doubtful character; and also as the matter has been argued and fully canvassed on the merits on both sides, I prefer to look into the facts of the case, and see whether any of the charges of fraud are sustained by the evidence, and if so, whether they are of such a character as should in equity impeach the decree.

The first charge of fraud relates to the procurement of the renunciation of the office of executor on the part of David B. Smith and the complainant.

On this subject the bill charges, that the executor, having previously determined to retain possession of most of the personal estate of the testator, did not, on occasion of the reading of the will, produce any account or statement of the property or money or income of the testator; but on being asked some questions in relation thereto, the morning after, he pretended to take offence, and immediately, and without any cause or provocation being given, sought to quarrel with the complainant, declared that he would not act with him as executor, and demanded that he should renounce the office. He refused to have the will inspected, or to offer it for probate, until complainant and Smith should renounce; represented it as the dying request of his father that

he should settle the estate, and offered to do it without commis-sions. Finding that he was determined upon an open family rupture, complainant was compelled by his hostility to renounce the office of executor. He then applied to David B. Smith, and when he found his offers of settling the property were likely to fail, he threatened to enter up judgment against Smith on his bonds, and ruin him and destroy the peace of his family; and under these threats and circumstances, Smith also renounced; and Mary Yorke having also renounced, the defendant was now sole executor.

The defendant, in his answer, admits that he declined acting with the complainant as an executor, but denies that he pretend-ed to take offence or sought a quarrel. He says, that from the moment the will was read, the complainant manifested the most deadly hostility against him. He declared that he would make this defendant exhibit an account of all the moneys received and expended by him during the last three years of his father's life, and of all the meals he had eaten in his father's house during that time. He refused to execute a quit-claim to Lewis L. Yorke, according to the request of the testator, for twelve acres of land which were not included in the will. He refused to let Mary Yorke, the widow, retain the household furniture and pro-perty at the appraisement, but insisted they should be sold and the most made of them. He also uttered offensive charges and made insinuations against the defendant, which he was obliged, out of self-respect, indignantly to repel. These, the defendant says, were the causes of the rupture, and the reasons which in-duced him to decline acting with the complainant in the settle-ment of the estate. The defendant denies, also, that he made use of any threats to induce David B. Smith to renounce, such as the complainant has set forth.

The charge, so far as relates to the means used to induce a renunciation on the part of Dr. Vanmeter, is rather vague in its character, and with perhaps a single exception is sufficiently an-swered. The exception relates to the refusal to have the will of the testator inspected. To this there is no answer. But I can-

not perceive how that was to operate as an inducement for the complainant to give up the executorship. It is evident from the bill and answer, that a family difficulty commenced about the time of reading the will, or soon after. Which party was to blame, it is not needful to inquire; but in the fact of its existence as between Dr. Vanmeter and the executor at this early period, may be found a sufficient motive for the determination of Mr. Jones not to serve in the office of executor in connection with his brother-in-law, the complainant, without imputing to him the desire of getting the whole property in his hands for the sake of taking an undue advantage. So far as the charge is denied by the answer, it must pass for nothing; for I do not perceive any evidence to support it.

That part of it which imputes to the defendant the use of unmanly threats towards David B. Smith, to compel him also to relinquish, is very directly denied by the answer, and this is entirely corroborated by the testimony of Smith himself, who was examined as a witness. He says that Jones requested him to renounce, saying that he, Jones, could settle the estate better than any one else, and he had rather do it himself; but the witness expressly says, he does not know that Jones ever made use of any persuasion or argument to induce him to renounce. The threat about the judgment bonds was, according to the testimony of Smith, two or three weeks afterwards, and had relation to different matters altogether.

It is very evident that Jones was anxious that his brothers-in-law should not be associated with him in the settlement of the estate. He admits that he was desirous of settling it alone, alleging that it was his father's wish that he should do so; but he denies that in this desire he was influenced by any improper motive. I do not perceive that there is any thing in this part of the case to charge him with impropriety of motive or conduct.

If Jones was bent on defrauding the family, of what importance was it that he should have the sole management of the estate; or how were the rights of Vanmeter and Smith impaired by the renunciation? The obligation to account on the one

67

side, and the right and power to compel an account on the other, still remained. There is no pretence that any of the property has been concealed. If Jones was indebted to the estate for large sums advanced, the debt was cancelled by the will, with the exception of the note, which was to be paid. That this note was no longer in existence, was not concealed from the parties interested. It was communicated on the first occasion that offered, to wit, the reading of the will, and before any thing was said about renunciation. If he had taken to his own use moneys received for his father when in a state of imbecility, for which he refused to account, their remedies against him were not taken away. They knew he had acted for his father, and the whole subject matter was open for investigation. They stood on as good, perhaps better ground as legatees than as co-executors; for they have been enabled, in the various stages of this controversy, to make use of each other's testimony, as occasion might require—a privilege which as co-executors they might not have enjoyed.

If the intention of the defendant was to commit a fraud, it appears to me he took a singular course to accomplish his object. He began by frankly communicating just what he ought to have concealed; and he used menaces and threats, when mildness would have answered a much better purpose. If he desired to get the whole assets in his own hands, that he might the more easily withhold that part which was supposed to be due from himself, why did he disclose the fact that the note which he was required by the will to pay, had been given up and cancelled, and would not be accounted for as part of the estate? Why did he not conceal that important fact until he had accomplished his object and found himself safely on the vantage ground? Why did he unnecessarily and without cause, according to the complainant's showing, excite angry feelings, the natural tendencies of which were to induce opposition to his wishes? Upon the ground assumed by the complainant, the whole matter is inexplicable.

Dismissing this part of the case as untenable, I proceed to

consider briefly the second charge, which relates to the fraudulent procurement of the receipt given by the complainant for his wife's share of the personal estate, under the will.

In relation to this, the bill states, in substance, that after the will was proved the defendant refused to give any account of the estate, or have any appraisement of the personal property, constantly offering to settle with the complainant, declaring that his wife's share would not be quite three thousand dollars; that he made many excuses to his sister, Mrs. Vanmeter, for his rude and improper conduct towards her husband; and stated that although her share would not amount to three thousand dollars, yet he would make up that sum and would pay immediately the legacy of five hundred dollars, bequeathed to Thomas J. Vanmeter, her son. That his strong representations as to the property of the testator, and his solemn declarations of his perfect knowledge therein; his asseverations that it would not amount to three thousand dollars apiece, and his professed repentance for former misconduct, induced the complainant and his wife, for the sake of avoiding a family dispute, to agree to accept the three thousand dollars in full for her share of the estate; and upon receiving an assignment of bonds, and thirty dollars and fifty-nine cents in money, the complainant signed a receipt for the said share.

To this the defendant answers, that he has no recollection that at the time of reading the will any thing was said about the probable amount of the estate; but a day or two after, being in company with complainant and David B. Smith, the latter inquired what the probable amount of the personal estate would be. The defendant answered, he did not know, he had made no estimate. Complainant then observed, that the testator had told him it would amount to about three thousand dollars for each of the residuary legatees; adding, that if any part of Dr. Rowan's bond was lost, it would probably fall short of that sum. At the next interview, the defendant informed Vanmeter and Smith, he had no doubt the net amount of the personal estate would exceed three thousand dollars apiece if no losses were sustained. After

this, no communication took place directly on the subject between Dr. Vanmeter and himself; but a proposition was made by the complainant to him, through his sister, Mrs. Yorke, that if he would agree to pay him down the sum of three thousand dollars, and would also pay him his son's legacy of five hundred dollars, he would be satisfied, and would release the defendant from any further claim he might have against him as executor. To this proposition the defendant agreed, and requested his sister to inform her husband. The next day he visited his sister at her written request. She then insisted, that in addition to the three thousand dollars he had agreed to pay the complainant, he should also give him the crop of wheat, corn and oats on the Remster place, belonging to the estate; representing that the complainant had rendered many services to the testator without charge, and if the grain was given up he would be perfectly satisfied. To gratify his sister, the defendant agreed to this also; upon which a long conversation of a friendly character took place between them, in which he told her, among other things, that some things he had said to her husband were said in a moment of anger; but he denies that he expressed any contrition for any thing he had done, or that he made any representations with a view of deceiving her as to the probable value of her share of the estate. He made the same representations to her that he had made to the complainant, as far as he recollects, and to the other legatees. He did not profess to have made any examination for the purpose of ascertaining precisely the amount of the estate, but expressed the opinion he honestly entertained, and in which he might very easily have been mistaken. He told Mrs. Vanmeter that the dividends would certainly amount to three thousand dollars, and would not at all events fall far short of that sum. He denies that he ever refused to have an appraisement, and has no recollection of ever having been requested to have the property appraised, until after the will was proved.

Such is the charge, and such the answer. The gravamen of the complaint is, that the defendant, having knowledge of the amount of the property, refused to make it known and exhibit

an inventory; and, representing that the shares would not be three thousand dollars each, constantly offered to settle with the complainant; and represented to his sister, Mrs. Vanmeter, that although her share would not amount to three thousand dollars, yet he would make up that sum, and would pay the legacy at once, and also her son's legacy; and that it was agreed to for the sake of avoiding a family dispute.

That there was no exhibit made of the amount of the personal property, is certainly true; and it is a little singular that the parties should have made a settlement without it. But that the defendant ever refused to make one, or exhibit an inventory, he expressly denies, and says he was not asked to have the property appraised till after the probate of the will. There is no evidence to dispute this. What testimony there is on the subject goes rather to corroborate the answer. David B. Smith says, he thought it hard that the defendant did not furnish a statement of the property; he thought it his duty to do it; but he says the executor never refused to do it because he never asked him for one, and he does not know that Dr. Vanmeter ever did.

It is alleged also in this charge, that the defendant was constantly offering to settle with the complainant. This is also denied in the answer, and there is nothing to support the allegation so far as regards the offers to settle. The offers, it would seem, came from the other side. The first one, according to the answer, was made by the complainant through the medium of Mrs. Yorke, and was accepted on the part of the executor. This is confirmed by the evidence of Mrs. Yorke; and I do not see any thing in the whole case to induce the conclusion that the executor, under the circumstances in which he was placed, manifested any undue anxiety to make a settlement with Dr. Vanmeter, or that he was desirous of doing it before the Doctor should find out the amount of the estate.

It is alleged, too, that in those constant efforts to settle, he represented that the shares would not be quite three thousand dollars each. In relation to this, it is charged in the bill, that when the will was read, the defendant stated very explicitly that

[Vanmeter v. Ex'r of Jones.]

there would not be three thousand dollars coming to each one un-der the residuary clause. The defendant says, he has no recol-lection of having so said ; but it is fully proved by the testimony of David B. Smith, and must be taken as true. At the time this declaration was made, there were no papers exhibited, no examination made by any one; and it is very evident, if other parts of the defendant's answer responsive to the bill are to be believed, that the settlement was not made on the faith of that statement. He says, that a day or two after the will was proved, he stated to Smith, in the presence of the complainant, that he had made no estimate of the estate ; and that at a subsequent interview with Smith and Vanmeter, he told them he had no doubt the net amount of the personal estate would exceed three thousand dollars apiece if no losses were sustained. These state-ments are not denied by Smith ; on the contrary, Smith says, he remembers perfectly well that the defendant told him the estate would pay to each one more than three thousand dollars. His first impression was, that this was after the settlement, which would appear to give countenance to the idea that the defendant had knowingly misrepresented for the purpose of effecting a fa-vorable settlement ; but on further examination, he said it ap-peared to him the conversation was near about the time of the renunciation of the executorship, which was some time before the settlement with Vanmeter. If Jones had contemplated to practice a deception on Dr. Vanmeter with respect to the amount of the estate, he would scarcely have made such a communica-tion to Mr. Smith at that time, he being also concerned in the amount of the estate, and on terms of intimacy with the com-plainant. In addition to this, the defendant says, he stated to Mrs. Vanmeter, before the settlement took place, (and when she was acting as a kind of agent for her husband,) that if no losses occurred the property would certainly amount to three thousand dollars a share, and would not at all events fall far short of that sum.

Take, then, the answer and the evidence together, and it is not proved that the defendant was constantly offering to settle,

declaring that Mrs. Vanmeter's share of the property would not amount to three thousand dollars. They show, I think satisfactorily, that there was no intention on the part of the defendant to deceive or circumvent the complainant, and that he was not deceived. The different statements made by the defendant as to the amount of the property, show that they were founded on mere estimates. The complainant chose to be satisfied with these, without procuring the information which it was in his power to obtain if he chose; and I do not perceive what complaint he can now make even in equity.

In cases of family agreements and compromises, there must always be a mutual trust and confidence between the parties; and if there is any concealment of material facts, the compromise will be held invalid: *Gordon* v. *Gordon*, 3 *Swanst. Rep.* 399—463; 2 *B. and Beat. Rep.* 171. I have examined this evidence attentively to ascertain whether there was any such concealment of material facts, and my impression is clear that there was not. The defendant very frankly communicated to the parties interested, in the outset, that the note mentioned in the will, for which he was to account, had subsequently been given up to him by his father, and of course could form no part of the assets. This was a material fact, and the complainant had a right to know it, and the concealment of it might have been sufficient to avoid the release. But I am unwilling to carry the principle so far as to say, that because the defendant did not tell Dr. Vanmeter that he had not included in the estimate what is now claimed to be due to the estate from him as agent for his father, upon the ground that the testator was entirely incapacitated for business, that this was the concealment of an important fact. The defendant denies any such indebtedness or liability on his part, or incapacity on the part of the testator. There was no such claim made at the time—nothing was said on the subject—and I cannot conceive that the defendant was under any equitable obligation to speak of a claim which he did not know of, and therefore could not suppose formed any part of what was to be settled. This would be to convert

a wholesome rule into a trap for the innocent and unsuspecting.

I have already stated that the settlement, at the time and under the circumstances, was a little singular. A single fact stated in the answer of the defendant, may aid in furnishing an explanation. A day or two after the will was read, Smith, Vanmeter and the defendant were together, and Smith inquired what the probable amount of the personal estate would be : to which defendant replied, he did not know ; he had made no estimate. The complainant then said, that the testator had told him it would amount to about three thousand dollars for each ; adding, that if any part of Dr. Rowan's bond was lost, it would probably fall short of that amount. It would seem from this that the complainant had knowledge from another source than the defendant, what would be the probable amount of his share ; and I think there can be little doubt, that in making the settlement, he acted on that knowledge, as well as what he gathered from the opinion of the executor.

Thus informed, he, or his wife for him, asked for other property in addition, to the amount of eighty-five or ninety dollars, which was given. He received the whole in a very short time after the testator's death, together with the legacy to his son, without trouble, loss or deduction for commissions—gave a release, containing an indemnity against all loss the estate might sustain, and declared himself perfectly satisfied.

I see no ground to disturb the decree of the orphans' court on account of any fraud in this receipt. The charge is not supported.

3. It is insisted, however, in the third place, that the appraisement was illegally and fraudulently made.

The bill states, that after the receipt was given by the complainant, the executor called in two respectable citizens to make an appraisement of the personal property ; told them he had settled with all the heirs and legatees, and there were no debts, and that the appraisement being a mere matter of form, it would not be necessary to examine any of the obligations, notes, mortgages,

books, &c.; and the appraisers, confiding in his statements, did not examine any of them, but took the same from a memorandum prepared by the executor, or some one under his direction.

The defendant, in his answer, denies that he represented to the appraisers that he had settled, or was about settling, with all the heirs and legatees, and that as there were no debts, the appraisement was a mere matter of form. On the contrary, he says the bonds, notes, &c. were all produced, and all the personal property carefully examined by the appraisers. He admits that he made a memorandum of the bonds, securities and principal articles of personal property, as a guide to the appraisers, but the articles themselves were afterwards produced and examined. He asserts that the appraisement was fairly made, and includes every article of personal property known to belong to the testator.

There is some discrepancy in the testimony of the appraisers upon one point. One of them states that the bonds and notes were produced, but were not particularly examined; that they were enveloped in a paper, which the witness unwrapped; he thinks he opened one or two, and saw the endorsement of several. The other appraiser insists that there were no bonds or notes produced, at least he saw none, and that the appraisement was made from a list furnished by Mr. Yorke. There is doubtless some mistake, some misrecollection on the subject, and there is no occasion to impeach the testimony of either of these respectable witnesses. The one is an affirmative, the other a negative witness; and the law directs the course to be pursued, without at all calling in question the veracity of either. Besides this, the testimony of Thomas Jones Yorke, who was present, and aided in taking the inventory, is satisfactory to show that the bonds were all produced. If they were not separately examined, it was not the fault of the executor; for Mr. Sinnickson, one of the appraisers, says, it was at his own suggestion, and not that of the executor, that the list was taken by them instead of the bonds. In all other matters the appraisers agree substantially in their testimony, and support the answer. Both agree in stating that

68

there was a disposition manifested to show all the property and have it appraised. There was no effort to conceal any thing. They went from the garret to the cellar, and appraised every thing that was pointed out to them by Mr. Yorke as the property of the testator. There were some few fancy articles, said to belong to Mary Jones Smith, which were presents from Lewis Yorke, not appraised, and also some goods claimed by Mrs. Yorke.

It is evident that the inventory as taken, was taken in good faith; and the allegation of the complainant, that the defendant represented to the appraisers that it was a mere matter of form, as the legatees had all been settled with, and all the debts were paid, is not only denied by the answer, but finds no support in the evidence. One of the appraisers says he has no recollection of any such conversation, or any thing like it; and the other says nothing in relation to it.

There is, then, no fraud, or even irregularity on the part of the executor, connected with the taking of the inventory. If the appraisers did not perform their duty in making a separate examination of the bonds, the blame cannot rest on the executor. They were presented and shown. If any mistake has arisen from this mode of doing business, it should be pointed out. There is clearly no fraud.

While on this subject, I must be permitted to say, that the form in which the inventory is made out and presented to the surrogate, is exceptionable. It is not, strictly speaking, an inventory, but rather an abstract or compendium of one. One item is, " Cash, bonds, notes, &c. $13,993 06." Another, " Household goods and kitchen furniture, $298 00." A third, " Horses, cows and swine, $268 00." This is a common mode, I believe, in some parts of the state. A particular list is made out in the first place, as the appraisement proceeds; but before it is sent to the office it is abbreviated so as simply to show gross amounts. This is done, as in the present case, without any intention of doing wrong; but the practice is not to be commended. Surrogates would do right to reject such papers as invento-

ries. They often work injury to creditors and legatees, and sometimes involve executors and administrators in serious difficulty. In fact, it is almost impossible to settle any estate with intelligence and accuracy without other aids than they furnish.

4. Another charge is, that the note of the executor, mentioned in the will, the principal of which was to be accounted for by him, was not included in the appraisement, and has not been accounted for in the settlement.

The complainant charges the amount of this note to have been from six thousand to thirteen thousand dollars.

The answer states, that no such note was in existence at the time of the testator's death. It was given up and cancelled by the testator more than two years before his death, in the presence of his daughter, Mary Yorke, voluntarily, with a perfect knowledge of what he was doing, and in consideration of the services rendered to him by the defendant after the making of his will. The amount of the note was one thousand dollars.

It could not have been a matter of surprise to the complainant that this note was not put in the inventory. He knew it formed no part of the estate when he made the settlement, and took the three thousand dollars as his wife's share. If he did not know of the cancellation of this note before the death of the testator, he knew it very soon after ; for, according to his own showing, it was communicated by the executor without any reserve, on the day the will was read. There was, then, no surprise on the complainant. He was under no misapprehension on the subject, and if he was not perfectly satisfied with what had been done, it is not easy, upon the ordinary principles which govern men in the transaction of business, to account for his making a voluntary settlement, at so early a period, especially if he believed, as he now charges, that the amount of the note was from six thousand to thirteen thousand dollars.

It may be said, however, that he did not then know that the note was given up to be cancelled at a time when the decedent was incompetent to transact business, and when he might easily

[Vanmeter v. Ex'r of Jones.]

have been imposed on, and that it was given up without consideration.

If the complainant knew that such a note was once in existence, and believed the amount was any thing like what is now represented, it is strange that he did not, before he made the settlement, make a single inquiry as to the circumstances of the transaction;—when the note was given up, and why? and who was present? Such inquiries would have been natural and proper. It does not appear that any such were made.

But passing this by, it becomes proper to inquire whether the testator, at the time, was competent to the transaction of business?

The bill charges, that he died at the age of seventy-nine years, and that for several years before his death he was in a feeble state of bodily health, and his mind was affected so as to render him incapable of the management of his affairs; that his disability both of body and mind gradually increased. He had had three attacks of apoplexy and palsy; his right side was useless, and his speech so much affected as to be unintelligible to strangers.

The defendant answers to this, that sometime in the year eighteen hundred and twenty-six testator had a stroke of paralysis, which deprived him in a great measure of the use of his right arm and right leg, and materially impaired his speech; but he could move about with assistance, and visited the store of the defendant almost daily until within two days of his death. Defendant denies that his mind was so far destroyed as to render him incapable of managing his affairs, but says it was sufficiently vigorous to take an interest in all his concerns and to give a general direction and control to his business. His memory was more than ordinarily good for one so far advanced in years. He always recollected with great accuracy when his rents and the interest on his bonds and notes became due.

The complainant, in support of the charge, has produced a number of witnesses, and their opinions are given at length on the capacity and incapacity of the testator. These opinions in

this and all other similar cases, require to be looked at with caution, and well weighed. It happens, too often, that disability of mind and body are not properly distinguished, and opinions are formed and expressed which on examination are proved to be unsupported.

The first witness of the complainant to this point, came to the conclusion that his mind was in such a state as to incapacitate him from doing business; but on his cross-examination he admitted that he had never taken particular pains to ascertain much about it. He never perceived that his mind wandered, or that he was irrational in conversation, and was not prepared to say that if he had enjoyed the entire use of his speech he could not have transacted business.

Impressions like those of this witness are very naturally formed. The testator had been for many years a man of active business. He was suddenly stricken with palsy, and he could no longer walk or help himself. He was dragged from his house to the store in a little wagon, like an infant; when spoken to he could not respond, or if he made the effort the sounds he uttered were so unnatural as to be unintelligible in a very great degree, except to those who were constantly around him. Under these circumstances, it is no impeachment of the veracity or motive of the witness when it is formed and declared, that his opinions, though honestly entertained, are not well founded.

The next witness, Morris Hancock, expresses no definite opinion on the subject. Ebenezer Smith speaks with great hesitancy. He thought his mind was affected at times, and he appeared to be in a state of second childhood; but he concludes by saying, he "founded his opinion of his incapacity to do business on his general appearance—nothing more than that." A more unsafe guide could not have been taken.

James Newell speaks with more point. He says he thought, from what he saw, that the testator was not capable of transacting business of any kind, in any way. He appeared deficient in mind and memory in particular. He had some conversation on one occasion with the testator, and the testator could not talk;

[Vanmeter v. Ex'r of Jones.]

witness could not understand him, and his recollection and me-mory appeared far gone.   This is the substance of the examina-tion in chief, and it is easy to perceive that the appearance of the testator had much to do with the formation of the witness' opinion. In fact he says, afterwards, that his opinion of the want of mind and memory of the testator was formed "from his appearance, and from what he appeared desirous of saying and could not say, and from indirect answers not directly to the point."   Now sure-ly his appearance, and his inability to talk, should have little to do in forming an opinion of the mental capacity of the testator. And as to his giving indirect answers not directly to the point, it ought to be remembered that the witness had already stated that he could not understand him when he attempted to hold conver-sation with him, and how exceedingly difficult it must have been for the testator to communicate his ideas intelligibly.   A conclu-sion formed from such premises can scarcely be considered safe. It may be remarked, too, that the witness limits this incapacity to "a year or more" before the testator's death.   This is very vague ; and when it is remembered that the giving up of the note was more than two years before his decease, it may be a matter of question whether the witness' opinion is to be consider-ed as extending back so far as to include that period of time.

Another witness, Henry Freas, thinks testator was incapable of transacting business from the year eighteen hundred and twenty-seven, till his death, in eighteen hundred and twenty-nine. He thinks his mind and body were both affected.   He says, as the other witness did, that it was difficult to understand him, and that he could not understand him himself.   Again he says, testator tried to talk, but could not so that he could understand him.   And yet it is evident from the testimony, that upon ob-servations of the testator, thus imperfectly made and imperfectly understood, the witness rests in part for his conclusion as to men-tal incapacity ; for he says, "sometimes the testator would make such answers that had no meaning in them."   And again, "I think I have discovered in some of his answers what was irra-tional, but I cannot now remember what it was particularly."

David B. Smith also testifies to his inability to transact business, but as he says nothing in regard to the state of his mind, his testimony is not material.

Without any evidence on the part of the defendant, this testimony could scarcely be considered sufficient to overcome the answer; but the witnesses of the defendant place the point in dispute in a clear light, and relieve the court from doubt.

Mary Yorke, the daughter, and Thomas Jones Yorke, the grandson, both testify to the mental capacity of the testator, and Mrs. Yorke refers particularly to the time when the note was given up, and states when and under what circumstances it was done, and what took place at the time.

Mrs. Yorke says, her father appeared to know every thing and understand his business; his recollection appeared to be good. He recollected when the interest was due on his obligations, and would say, " Don't neglect it." The family had no difficulty in understanding him after they became accustomed to his mode of speaking. He was in the habit of keeping the key of the chest where his papers were, and continued to keep it as long as he lived.

Mr. Yorke testifies further, that for three years before his death, the testator was afflicted in body, and lost the use of his right side. It was occasioned by palsy. He retained the use of his faculties generally. When he was afflicted with unusual sickness, his faculties were not so acute as in general health. His incapacity to do business arose from his physical and not from his mental infirmities. His business was generally transacted by his son Thomas Jones, under his direction, and he always seemed to understand the nature of it. His memory was as retentive as usual; he recollected the amounts of his bonds and notes, by whom given, and the amount of interest due; thinks a person could not have obtained money from him without his receiving value for it. He could generally make himself intelligible to the members of his family; sometimes there would be difficulty in understanding his meaning, but he was remarkable for persisting in his efforts until he made them understand

him. He was able to read. He was in the habit of reading newspapers, and he could read writing.

These witnesses are of the family of the testator. They knew him intimately, and could therefore speak with more confidence on the subject of his capacity than any others. Making due allowance for any natural bias which may be supposed to exist on their minds, I am of opinion that their evidence, added to the answer, is sufficient, notwithstanding the evidence on the other side, to inform the court, and govern its decision, as to the general capacity of the testator.

To this may be added the statements of Ann Hamilton, also an inmate of the family, who was called as a witness by the complainant. She says, that up to the time of the second attack, which was about forty-eight hours before his death, the testator directed things about the house, and paid the wages due her. He reckoned up himself what was due her, and took the money out of a purse he carried in his pocket, and settled. She cannot say when any such payment was last made, but it was within six months before his death. David C. Williams speaks also as to the capacity of the testator, and in favor of it, but it is unnecessary to pursue the subject further.

Mary Yorke testifies as to the giving up of the note. She remembers there was such a note, but cannot answer as to the date or amount. She says, " I went to the chest on that occasion to look over some papers on which money was due, and to get such papers. My brother called the attention of my father to that note. My brother said to him, 'Father, you may or will give up this note to me.' My father held it in his hand, looked at it for a few moments, and then said, 'Take it.' My brother took possession of it. My father then handed back the bundle of papers to be restored to the chest. My father's health at that time was very good. About this time his health was much better than at any other period of the three years above spoken of." " He knew what bonds and notes he had in that bundle; he recollected when the interest was due on the notes and bonds ; he generally knew about the time the interest was due, and would say,

' Don't neglect it.' This was his general habit up to his death. When he told my brother to take that note, I think he under- stood it perfectly. He seemed to be perfectly willing to give it up. He remarked when we were leading him away from the chest, at the time this note was given up, ' There will be enough for you all.' " On her cross-examination, she says, " When the note of my brother was taken out of the chest, I drew it out of the bun- dle. My father handed it to my brother. I handed it to my father. My father looked at the indorsement on the note. I suppose he could read it, or he would not have known it to be the right paper. Don't know if the sum was indorsed on it. I had never seen the note before. I don't think I knew before that time that my father held a note against my brother."

This is the whole of the evidence as to the giving up of the note. I cannot say there was any fraud in this transaction. If the testator knew what he was doing, (and there is nothing to lead to a contrary conclusion,) he had a right to do with his own as he pleased. There does not appear to have been any induce- ment held out, nor any persuasion used. The act was voluntary on the part of the testator; and whether it was actually in con- sideration of services rendered since the making of the will, as the defendant alleges in his answer, or whether it was a mere gift, without any valuable consideration passing, can make no difference in this investigation. The question before the court is a question of fraud; and if the testator was capable of doing what he did, and there were no deception, imposition, or other undue means used to accomplish the object, there could be no fraud, and of course there is nothing by which the decree of the orphans' court can be impeached.

As to the amount of the note, there is nothing to induce a be- lief that the defendant has misstated it in his answer. There was an effort made to impeach the testimony of Mrs. Yorke in relation to this note; but I think the construction put by counsel on the evidence of Rebecca Roberts was not the true construction, and that when her evidence is taken in connection with that of David I. Smith, the apparent difficulty is removed.

69

5. Another charge against the defendant is, that he has not accounted for the moneys received by him as agent for his father, while he transacted his business for three years before his death.

Upon this part of the case much has been said. It is shown that Jones the executor transacted generally the money concerns of his father for two or three years before his death, and that he received considerable sums of money. An estimate has also been made of the rents of the property; and it is sought to charge all these against the defendant, or at all events, to call on him to show what has become of them, and to charge him with what he cannot reasonably account for. And further, because he has not so accounted in the orphans' court, it is sought to impeach the decree, on the ground that the omission was fraudulent.

The defendant insists that no such liability attached to him. He says, that during the time he assisted his father in the transaction of his business, he kept no account or memorandum of the interest money received, or the debts collected by him, and paid over to his father, or the amount of the yearly income of the testator, or the rents and profits of his real estate, nor is it now in his power to exhibit an account thereof; that he was not the trustee of his father, nor his regularly constituted agent, although he received money for him and gave receipts for the same, owing to his father's inability to write; and that the money he received on account of his father, he paid over to him, without keeping any account or making any memorandum to which he can refer.

There is nothing to contradict or call in question the answer on this point; nothing to show that any part of this money was ever appropriated to the use of the defendant, or unaccounted for to the testator. If there were, the case would be different. But it appears to me, that without such proof, it would be exceedingly difficult to compel an account, even if no legal impediments existed such as are set up in bar in this case. Surely, then, there can be no pretence to disturb the solemn decree of the court. If more money than was necessary or usual, was spent in the family for the last three years of the testator's life, it was done under his own direction. Four hundred dollars he distributed among

his children within six months before his death. No fault is found with that proceeding. This constituted a part of the sum received. If a sufficient residue cannot now be found, no blame can attach, much less can any fraud be imputed, to the defendant.

6. There is one other charge which I think it proper to notice, viz.: That the decree of the orphans' court, as containing and declaring the balance in the hands of the executor, was procured by fraud, and should be set aside.

If by this charge it is intended that the decree of the court should be set aside for fraud existing in the component parts of the account, as well as the manner in which it was obtained, then the principal part of it has been already considered. But whether this be the meaning or not, no part remains to be looked at but the mode of procurement. In this I perceive nothing at which exception may be taken, unless it be the settlement or compromise with David B. Smith, and I cannot see that there was any thing fraudulent in that, or any thing about which the complainant had just cause of complaint. Dr. Vanmeter might have filed exceptions to the account if he had thought proper to do so. He took none. They were put in by Smith. If so done by agreement with Smith, and the defendant, knowing the fact, had made an arrangement with Smith to stifle investigation, it would have been fraud. But there is no charge of any collusion with Smith; and I think, under the circumstances, it was entirely justifiable in the defendant to buy his peace. The matter had once been investigated before the orphans' court, and they disagreed and came to no decision. It was ordered to be heard anew; and pending that hearing, the defendant says, that for the sake of peace, and to quiet an unhappy family dissension— and more than all, perhaps, to save the feelings of his sister, who was subjected to repeated examinations, and was greatly agitated by them, he agreed to pay Smith ——— dollars more than his share under the decree, and close the controversy. It does not appear on the face of the bill that there had been any previous investigation. The inference to be drawn from the allegation there made is, that the compromise took place before the

[Vanmeter v. Ex'r of Jones.]

material facts had been disclosed. The complainant says, that the investigation in the orphans' court, so far as it proceeded, fully disclosed the fraud which had been practised on him in obtaining the receipt; whereas the truth is, the whole matter had once before been under the consideration of the court.

I have now examined the different complaints or charges, after endeavoring to arrange them, so that if any were found to be supported, it might be seen whether they could have any legal or equitable operation as against the decree. I have considered every thing that appeared to me in any degree material; and I have satisfied myself that the charges are not sustained. In coming to this conclusion, I can scarcely hope to be so fortunate as to satisfy both parties of its correctness. If they will do me the justice to believe that I have faithfully and anxiously examined the cause with the desire of doing right, it is perhaps as much as I ought to ask. It is always a relief to know that if I have erred, the law has provided a remedy.

Let the bill be dismissed, with costs.